**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MOTOROLA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08 C 5427** |
| | ) | |
| **LEMKO CORP., XIAOHONG SHENG,** | ) | |
| **SHAOWEI PAN, HANJUAN JIN, XIAOHUA** | ) | |
| **WU, XUEFENG BAI, NICHOLAS LABUN,** | ) | |
| **BOHDAN PYSKIR, HECHUN CAI,** | ) | |
| **JINZHONG ZHANG, ANGEL FAVILA,** | ) | |
| **ANKUR SAXENA, RAYMOND HOWELL,** | ) | |
| **FAYE VORICK, and NICHOLAS DESAI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY,  District Judge:

Motorola, Inc. has sued Lemko Corp. and fourteen individuals under a variety of

theories arising from their alleged theft of Motorola's intellectual property.  Defendants

Lemko, ShaoWei Pan, and Nicholas Labun have moved for summary judgment on

Motorola's declaratory judgment claim for patent ownership.  Defendants Lemko, Pan,

Labun, Xuefeng Bai, Bohdan Pyskir, Hechun Cai, Jinzhong Zhang, Ankur Saxena, Faye

Vorick, and Nicholas Desai have moved for summary judgment on Motorola's claims for

misappropriation of trade secrets, usurpation of corporate opportunity, and breach of

contract.  For the reasons stated below, the Court denies both motions.

**Background**

The Court takes the following facts from the parties' memoranda of law and

statements of uncontested facts. On a motion for summary judgment, the Court construes all facts favorably to the nonmoving party and makes reasonable inferences in that party's favor. *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 552 (7th Cir. 2011).

In 2002, a group of people, including several who were or who had been Motorola employees, began to implement a plan to establish Lemko. The new company's slogan was "Wireless for the Next Billion People." Among the early documents created for Lemko was a white paper that described the problem the company intended to address and some of the technology it was developing or planned to develop:

> Cellular infrastructure is too expensive . . . because [it uses] an outdated design very similar to the old mainframe computer.
>
> The mainframe model employed a super computer at the center accessed by "dumb" terminals, computer screens with keyboards. The mainframe was the hub and the terminals were the spokes. All the brains were in the hub. . . . Desktop computing moved the brains out of the hub and into the spokes. The Internet connected the spokes and the hub disappeared for most applications.
>
> Cellular networks still use the old hub and spoke design. The cellular switch and base station controller constitute the hub while the base stations and cell phones are the spokes. Like the mainframe, the cellular hub (switch and controller) consists of large electronic equipment racks. It is the brains of the network. Additionally, the cellular hub is extremely expensive. An operator needs tens of thousands of users to get a positive or attractive return on investment. Furthermore, the hub must maintain constant and costly communication links called backhaul with all the base station spokes.
>
> In emerging and underdeveloped countries, these characteristics impede cellular companies from expanding coverage to urban fringes and offering services in rural towns and villages. . . . The cost to link a base station (spoke) to a switch (hub) is prohibitive in remote areas. . . .
>
> Lemko has developed a distributed architecture for wireless telecommunication networks. Similar to the desktop computing model, Lemko's solution decentralizes the network, which greatly reduces costs.

2

Lemko's Control and Soft-Switch Element, CASSE, is . . . the least expensive, *fully* functional, *combined*, cellular soft-switch and base station controller.  With CASSE, there is no need to buy the expensive hub equipment. . . .

Since CASSE is so inexpensive, it is now possible to deploy it alongside a base station.  In other words, an operator can push the intelligence from the center out to the spokes, creating a distributed network.  CASSEs can be connected to each other or to an existing cellular switch.

Pl. Ex. 12 at LEM112753-55.[1]

According to Motorola, the process of founding and developing Lemko involved the violation of a number of Motorola's rights, in particular defendants' theft, by virtue of their Motorola employment, of proprietary information.  Defendants deny Motorola's allegations.

Motorola makes two particular contentions that are now the subject of defendants' summary judgment motions.  First, Motorola accuses Pan and Labun of breaching their contractual duty to assign to Motorola the patents for all inventions they conceived or created during their employment.  Motorola seeks a declaratory judgment that it is the rightful owner of eight patents and ten pending patent applications (the "Lemko patents") that Pan and Labun obtained or filed and assigned to Lemko between 2004 and 2009.  Defendants[2] respond that Pan and Labun conceived and created each invention after they left Motorola.

Second, Motorola accuses all of the former Motorola employees of stealing trade

--------

[1] This citation and those in Part A of this opinion refer to the parties' submissions on Motorola's patent claims; the citations in Part B reference the trade-secret materials.

[2] When used in reference to the claims that are the subject of the two summary judgment motions at issue here, "defendants" means those defendants who have joined the motion being discussed – in this instance, Lemko, Pan, and Labun.

secrets – confidential and proprietary information, including technological concepts and source code. Defendants deny this accusation and contend further that Motorola has failed to comply with its discovery obligations in identifying the evidence that supports this claim.

Defendants have moved for summary judgment on Motorola's patent claim (count six) and all the claims they believe are related to the trade secrets accusation (count two for misappropriation of trade secrets, count five for usurpation of corporate opportunity, and counts seven through eleven and thirteen for breach of contract). The Court discusses the facts and evidence relevant to each motion in more detail below.

**Discussion**

Summary judgment is proper when the moving party shows that there is no genuine dispute over any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when, based on the record, a reasonable fact finder could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court views the record and draws all reasonable inferences in the light most favorable to the nonmoving party. *Outlaw v. Newkirk*, 259 F.3d 833, 836-837 (7th Cir. 2001).

**A.     Patent Claims**

Labun started working for Motorola in September 1989 and eventually became Director of Strategy for Motorola's New Enterprises division. Pan began working as a Motorola staff engineer in August 1994 and was promoted to Director of Advanced Technology and Development by approximately September 2000. At some point during their employment, Pan and Labun both worked on a Motorola project or group involving

4

"seamless mobility" technology, Pan as an inventor and Labun as the project head.

When Motorola hired Pan and Labun, it required each of them to sign an

employment agreement that contained the following language:

> In consideration of any employment, or continued employment by Motorola, Inc.
> or its subsidiaries (referred to separately or together as "Motorola") and the
> salary or wages paid to me, I understand and agree to the following provisions
> for the protection of Motorola property rights:
>
> . . .
>
> To assign and I hereby assign to Motorola as its exclusive property the entire
> right, title and interest in all my inventions, innovations, or ideas developed or
> conceived by me solely, or jointly with others, at any time during the term of my
> employment and which inventions, innovations, or ideas related to the actual or
> anticipated business activities of Motorola, or result from, or are suggested by,
> work which I do for Motorola.

Def. Ex. F.

While at Motorola, Pan and/or Labun were named inventors on over sixty

patents and patent applications that were later assigned to Motorola.  The latest of

these was filed on October 28, 2002.  Both Pan and Labun left Motorola in 2004, Pan in

late March and Labun in early May.  Both began full-time employment with Lemko

shortly thereafter, Labun eventually becoming Lemko's Chief Executive Officer and Pan

its Chief Technology Officer.  Both are also directors of Lemko.  They filed the first

Lemko patent application in November 2004 and the latest in June 2009.  Eight of the

applications have been granted to date.

Lemko was incorporated in mid-2002, but the parties dispute the degree to which

it was active and/or various defendants were taking actions on its behalf at that point.

Defendants argue that Lemko was an unfunded "shell of a company" with "no products,

no sales and no patents" until the second half of 2004.  Defs.' Reply at 6.  Motorola

5

argues that, regardless of Lemko's corporate viability, Pan and Labun began doing work for the new company, including conceiving of the inventions that are the subject of this claim, in 2002 or earlier, while they were still employed at Motorola.  As the Court discusses in detail below, to prove this, Motorola offers evidence of documents produced for Lemko before 2004, as well as communications during that time between Pan and Labun and other defendants, particularly Vorick and Desai.  Motorola contends that these documents establish pre-2004 Lemko activity and thereby constitute circumstantial evidence that Pan and Labun conceived of the inventions embodied in the Lemko patents during their Motorola employment.  Therefore, Motorola argues, under the terms of the employment agreements, it is the rightful owner of all eighteen Lemko patents.

Defendants argue that Motorola has produced insufficient evidence that Pan and Labun conceived of each invention before they left; that even if there is such evidence, the inventions are not "related to" Pan and Labun's work at Motorola or otherwise within the agreements' scope; and that either way, Motorola forfeited its claim by not recording its right to the inventions before Lemko did so.

Defendants argue that the employment agreements should be read by reference to patent law.  Patent law defines conception of an invention as the "formation in the mind of the inventor of a definite and permanent idea of a complete and operative invention, as it is hereafter to be applied in practice."  *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1356 (Fed. Cir. 2010).  Defendants argue that proof of conception requires corroborating evidence "which shows that the inventor disclosed to others his completed thought expressed in such clear terms as to enable those skilled

6

in the art to make the invention." *Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir.

1985). Defendants also argue that because each claim of a patent is considered "a

separate invention," *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984), Motorola

must produce corroborating evidence of conception and disclosure before May 2004 for

each of the 488 claims of the patents in order for a reasonable jury to find defendants

breached the agreement.

Motorola argues that the Court should look instead to *DDB Technologies, LLC v.

MLB Advanced Media, LP*, 517 F.3d 1284, 1290 (Fed. Cir. 2008), in which the court,

construing similar language in an employment agreement, treated the question of

patent ownership as one governed solely by the terms of the contract, which it analyzed

according to state law rather than patent law. *See also SiRF Tech., Inc. v. Int'l Trade

Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010) ("The question [of] whether the invention is

'related to or useful in the business of the Employer' within the meaning of the

agreement . . . is a matter of state law.")

The Court concludes that *DDB* and *SiRF* establish the proper framework for this

action. The Federal Circuit considered in those cases essentially the same claim that

Motorola is making and recognized that the parties did not necessarily use terms in

their agreements in the same way in which they are defined in patent law. The patent-

law corroboration rule upon which defendants rely comes from cases in which parties

sought "to prove conception via the oral testimony of a putative inventor," who "might be

tempted to describe his actions in an unjustifiably self-serving manner in order to obtain

a patent." *Singh v. Brake*, 317 F.3d 1334, 1341 (Fed. Cir. 2003). A district judge

recently rejected, in a case involving issues similar to the present one, a plaintiff's

argument that proof of

> conception further requires disclosure, and that it must encompass all limitations
> of the claimed invention. As the defendant correctly points out . . . this exacting
> standard hails from a line of cases involving claims in which the plaintiff sought
> [to] be added as a co-inventor or from interference proceedings, in which policy
> concerns about self-serving claims of inventorship require courts to exercise the
> greatest caution. It is in this context . . . that courts have hewn to the line of the
> patents themselves to determine whether and when the complete and operative
> invention has been conceived.

> As the *FilmTec* court makes clear, a less stringent standard applies when
> determining whether patent rights were contractually assigned. Indeed, in
> *FilmTec*, the Federal Circuit Court of Appeals held that the district court had
> erred by resolving the issue of title to the patent-in-suit according to the patent
> claims rather than the terms of the operative contract.

*Leighton Techs. LLC v. Oberthur Card Sys., SA*, No. 04 C 2496, 2007 WL 2230157, at

*14 (S.D.N.Y. July 11, 2007) (citing *FilmTec Corp. v. Hydranautics*, 982 F.2d 1546 (Fed.

Cir. 1992)) (internal citations omitted). The Court finds these decisions persuasive.

Because Pan and Labun's employment agreements stated that they "hereby

assign[ed]" their interest in related inventions to Motorola and did not require any further

action on the inventors' part, any inventions meeting the agreements' requirements

belong to Motorola. *See DDB*, 517 F.3d at 1290. Thus, the relevant question at this

juncture is whether there is evidence from which a reasonable jury could find that these

particular inventions were within the scope of the assignment term contained in Pan

and Labun's employment agreements.

In *DDB* and *SiRF*, the court found that the employment agreements were

"ambiguous as to what is 'related to' or 'suggested by'" an inventor's work for a

company "because resort to extrinsic evidence, for example, as to the nature of [the

company's] business or to that of [inventor's] work, is necessary to determine whether

8

the provision applies." *DDB*, 517 F.3d at 1292; *see also SiRF*, 601 F.3d at 1326 ("Neither the agreement nor [state law] specifies what it means for an invention to be 'related to or useful in the business of the Employer.'"). In both cases, the Federal Circuit cited state law allowing it to resort to extrinsic evidence to determine the meaning of ambiguous contract terms.

"When interpreting written contracts, the trial judge initially makes the determination of whether the contract is ambiguous or unambiguous as matter of law." *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993). The Court finds that the terms "related to the actual or anticipated business activities of Motorola, or result from, or are suggested by work I do for Motorola," which are very similar to those discussed in *DDB* and *SiRF*, are ambiguous. Like the terms in *DDB* and *SiRF*, the meaning of these terms may depend on extrinsic evidence. Under Illinois law, the meaning of an ambiguous contract is a question for the trier of fact, which must consider the language of the contract along with any extrinsic or parol evidence presented by the parties. *LaSalle Nat'l Bank v. Serv. Merch. Co.*, 827 F.2d 74, 78 (7th Cir. 1987).

The Court finds, however, that the terms "developed or conceived . . . during the term of my employment" are not ambiguous. Their meaning is sufficiently clear that a jury could simply examine evidence of when the inventions or ideas embodied in the Lemko patents first came into existence in order to determine whether Pan and Labun's actions were within the scope of the contractual term.

The Court therefore considers whether a reasonable jury could find that the evidence that Motorola has produced demonstrates, first, that the subjects of the

9

Lemko patents are "inventions, innovations, or ideas related to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which [Pan and Labun did] for Motorola," and second that they were "developed or conceived by [Pan or Labun] solely, or jointly with others, at any time during the term of [their] employment." Def. Ex. F.

### a. Relatedness

Motorola argues that all eighteen of the Lemko patents relate to "distributed mobile architecture" (DMA), a system or aspect of Lemko's products that Motorola contends is a different name for or a new version of CASSE. Motorola then argues that DMA or CASSE or both are "related to" or "suggested by" the work that Pan and Labun were doing at Motorola.

The titles of thirteen of the Lemko patents specifically refer to DMA. Those patents, as well as the other five (four of which have titles referring to "wireless communications"), refer to DMA multiple times throughout their claims. Defendants do not appear to dispute that all of the patents involve DMA, but they vigorously dispute that DMA and CASSE are related.

In support of its contention that the two are related, Motorola first offers several documents suggesting that the name CASSE changed to DMA or that the two names were interchangeable at one point. A document entitled "Lemko Corporation Control and Soft Switch Element (DMA) Acceptance Test Document for China" refers to "Lemko's Control and Soft-Switch Element, DMA," suggesting that DMA is another name for "Control and Soft-Switch" (CASSE). Pl. Ex. 23 at 1, 5. A July 2004 e-mail from Desai states, "I am happy to send you more information regarding the Lemko

10

CASSE (now called the Lemko DMA)." Pl. Ex. 27. A May 2008 e-mail from Vorick to Pan says, "All documents now refer to DMA for consistency. Previously some documents referred to CASSE and other referred to dMARC." Pl. Ex. 22. In response to the question, "The WLL [(wireless local loop)] product you told me about, what was the name of it?", Labun testified, "CASSE, DMA, DMAX, DMARC, something like that. All kinds of names, marketing terms." Pl. Ex. 67, Labun Dep. 95:15-20.

Motorola also offers evidence of technological parallels between CASSE and DMA. A Lemko business plan describes how the company "has taken the basic telephony functions from a cellular Mobile Switching Center (MSC) and a Base Station Controller (BSC) and substituted them with CASSE." Pl. Ex. 2 at 3. A Lemko informational document copyrighted 2003 and 2004 states, "Lemko's DMA replaces the most expensive, least flexible parts of the system – the MSC and the BSC." Pl. Ex. 8 at LEM013602. Side-by-side diagrams on the same page, under the heading "The Lemko DMA Approach," contrast a "traditional cellular network," in which boxes labeled "MSC" and "BSC" are connected to boxes labeled "BTS," with the "Lemko cellular network," in which boxes labeled "CASSE" are connected to the BTS boxes. *Id*. This document also makes the same analogy – that mainframe computing is to desktop computing as current cellular networks are to DMA – that early Lemko documents made regarding CASSE. *Id*. at LEM013599. A PowerPoint attached to a July 2003 e-mail from defendant Raymond Howell contains a diagram describing how Lemko's system connects the "Urban Fringe" with the "City Area" and containing a box labeled "CASSE." Pl. Ex. 11 at LEM112741. Lemko's '158 patent, dated May 26, 2009, contains a diagram that is identical in every respect except that the CASSE box has been replaced

11

by one labeled "DMA."  Pl. Ex. 39 at Sheet 10.

In opposition, defendants present deposition testimony from Vorick that the systems are completely different.  They also offer an explanation in an interrogatory response that "CASSE was a marketing term used to describe a wireless local loop solution. . . . DMA was not conceived as a product, but is an abbreviation for a simplified explanation of a possible new architecture for building cellular networks." Def. Ex. M at 11.

A reasonable jury could well believe defendants' contention that DMA is distinct from CASSE.  Motorola has produced evidence, however, from which a reasonable jury could infer that CASSE and DMA were significantly related.  The evidence of the terms used in defendants' communications and Lemko documents could support a jury's finding that the name of a Lemko concept or system was changed from CASSE to DMA.  The evidence of technological parallels could support an inference that the system or technology called CASSE accomplished precisely or nearly the same function as DMA, and/or that the CASSE element was incorporated in the overall DMA system.  Together, this evidence would allow a reasonable jury, upon a finding that Pan and Labun conceived or developed CASSE while employed at Motorola, to infer that DMA, as a renamed, modified, or expanded version of the same technology, was therefore similarly covered by the employment agreements.  Connections between Pan and Labun's work at Motorola and either CASSE and DMA could therefore support the inference that there were also connections to the other system.

Motorola argues further that its evidence shows that the subjects of the Lemko's patents and applications were "related to the actual or anticipated business activities of

Motorola, or result from, or are suggested by, work which [Pan and Labun did] for Motorola," in particular their work on seamless mobility. Courts defining relatedness in this context have done so broadly. *See, e.g.*, *Picture Patents, LLC v. Aeropostale, Inc.*, 788 F. Supp. 2d 127, 136 (S.D.N.Y. 2011) (finding that the "plain terms" of an agreement to assign any invention that "relate[s] to the actual or anticipated business or research or development of IBM" covered "any invention remotely related to computers"); *Larson v. Correct Craft, Inc.*, 537 F. Supp. 2d 1264, 1268 (M.D. Fla. 2008), *vacated on other grounds*, 569 F.3d 1319 (Fed. Cir. 2009) ("Even though [boatmaker] never told specifically told [inventor] to design a [device] (or to solve the particular problems that the [device] remedied), both logic and [inventor's] own conduct show that it fell within the category of things he was assigned to accomplish – i.e., to improve [boatmaker's] boats."); *cf. Freedom Wireless, Inc. v. Boston Commc'ns Group, Inc.*, 220 F. Supp. 2d 16, 19 (D. Mass. 2002) ("Prepaid wireless billing does not relate to the methods of conducting a business dedicated to developing satellite-base and rocket-based services."). The agreements that Pan and Labun executed contain language that invites a similarly broad interpretation.

Pan and Labun's work at Motorola included, but was not limited to, "seamless mobility" technology. Labun testified that the applications of seamless mobility included allowing movement "from a wide area network, or the cellular to noncellular network, seamlessly. And the process is all about the phone, dual system phone. . . . [A] mobile subscriber handset has capabilities designed into it which allow it to move from a cellular network to a Bluetooth network." Def. Ex. U, Labun Dep. 32:19-33:3. A Lemko "System Function Specification" describes Lemko's technology as "support[ing] wireless

13

voice, data and multimedia services crossing different WAN and LAN/PAN systems. The Lemko system not only supports the voice/data handoff between the same cellular system, but also supports the voice/data handoff between different systems." Pl. Ex. 7 at 9.

Motorola also presents a document entitled "Lemko's Solution for Remote Hotspot Cellular: Technical White paper" that is dated July 9, 2002. Although most of the document describes Lemko technology, it also contains the following paragraphs:

> Lemko solution is a complete Enterprise communications solution that enhances existing capabilities, creates new capabilities, lowers costs and increases user efficiencies. The solution represents an opportunity for France Telecom to offer wireless voice over IP (VoIP) telephony services, creating new revenue opportunities, increased ARPU, and decreased user chum. *Motorola's Seamless Mobility* solution will make life easier for France Telecom's Enterprise customers by allowing them to effectively and efficiently reach any employee, anytime, from anywhere.

> *Seamless Mobility* represents the convergence of wired and wireless communications networks. As communications technologies emerged, they came about separately, with individual networks created for voice, wireless voice and data communications. . . .

> Today's environment shows a shift to converging these traditional networks, creating one combined network for wired voice and data communications. *Motorola's Seamless Mobility* solution extends and greatly enhances this idea by including wireless voice and data networks in this convergence.

Pl. Ex. 31 at 4 (emphasis added). The document also includes an illustration captioned "Block Diagram of Seamless Mobility System Partitions." *Id*. at 11. The document otherwise refers to "Lemko solution" or "Lemko system" throughout.

A reasonable jury could find from this evidence that seamless mobility and Lemko's technology both involved wireless devices capable of moving between different types of networks or systems. Motorola does not expressly argue that the

14

"Lemko solution" document or a portion of it was copied from previously written descriptions of seamless mobility. Nonetheless, a jury could infer that it was, or at least that Lemko's technology was closely related to seamless mobility or incorporated some of its aspects, allowing a written description of seamless mobility to serve as a template for a description of Lemko's technology.

Motorola's central proffer of evidence for the relationship between CASSE and seamless mobility is a pair of diagrams depicting the two systems. Pl.'s Resp. at 7. Both documents depict an interlocking, roughly rectangular web of labeled boxes connected by a series of lines, some of which are also labeled. The boxes presumably identify technological components of the CASSE and seamless mobility systems. Defendants correctly point out that the seamless mobility diagram includes portions labeled "Cellular Air Interface" and "Bluetooth Air Interface," whereas the CASSE diagram includes only the cellular component. Despite this, a number of these boxes and connections have the same label in both diagrams. These include boxes in the upper left and right corners of each diagram labeled "ISDN/PSTN" and "Intranet" or "Internet." Both diagrams also contain a set of four boxes identically labeled "Media GW," "GK," "C-RNC," and "C-SDU," and at least seven of the connections between or leading away from those boxes also have the same names.

The Court lacks the technological expertise to analyze meaningfully the degree to which these diagrams imply that one system relates to the other. *See Shukh v. Seagate Tech., LLC,* No. 10 C 404, 2011 WL 1258510, at *8 (D. Minn. Mar. 30, 2011) ("[W]ithout expert testimony describing exactly how [an inventor's] work was incorporated into [a] claimed invention, the Court cannot simply compare his work to a

different product and know to what extent his work was a part."). Neither party presents expert testimony on this point, nor do they argue in their briefs that the other side should have done so at this stage. This is perhaps not surprising, given that the deadline for expert disclosure in this case has not yet passed. The Court therefore declines to construe the absence of such testimony against Motorola, the non-moving party. Instead, the Court concludes that the numerous identical components in each diagram would allow a reasonable jury to use the diagrams, along with the other evidence discussed above, to support the inference that seamless mobility and CASSE are related.

As the Court has discussed, the descriptions of Lemko technology offered by defendants themselves describe communications systems, particularly mobile devices, that operate using both cellular and non-cellular networks. In light of the broad language of the employment agreement, the fact that Pan and Labun's work at both companies related in some way to cellular or mobile communications might be enough by itself to defeat summary judgment. *See Picture Patents,* 788 F. Supp. 2d at 136. Even analyzing the two companies' products more closely, however, the Court concludes that a reasonable jury could find that the Lemko technology embodied "inventions, innovations, or ideas related to" or "suggested by" Pan and Labun's work at Motorola in that both involved wireless devices capable of moving between different types of networks and that, as indicated by the diagrams, both contained several identically named and arranged components.

Defendants' suggestion that such a broad reading of their employment agreements would render them unenforceable is unavailing. The agreements, so read,

do not cover all of Pan and Labun's inventions in perpetuity, only those conceived during their employment at Motorola that related to Motorola's business or resulted from their work there.  Such requirements are not uncommon.  *See, e.g.*, *DDB*, 517 F.3d at 1290 (collecting cases).  Moreover, defendants cite no authority for the proposition that such a requirement is unenforceable when it is limited in this manner.  At this stage of the case, at least, the Court is unpersuaded that the employment agreements at issue are insufficiently limited in a way that renders them unenforceable.  *Cf. Freedom Wireless*, 220 F. Supp. 2d at 18 ("When [invention-assignment] contracts are open-ended with respect to time limit or subject matter, they may be considered unenforceable.").

For these reasons, the Court concludes that a reasonable jury could find the inventions embodied in the Lemko patents to be "related to" or "suggested by" Pan and Labun's work at Motorola.

### b.    Timing

In support of its contention that Pan and Labun conceived of the inventions while working for Motorola, Motorola first offers evidence that Lemko was operating as more than just a "shell of a company" by mid-2002.  This evidence includes a white paper dated July 2002 that details strategy and technology, including diagrams, for Lemko's "Least Expensive Mobile" system.  Pl. Ex. 2.  A "Lemko Corporation Business Plan," which appears to have been written before October 2002, details an "Operations and Management Plan" and a "Competitive Analysis" discussing vendors of wireless local loop, as well as a section on "Product Design and Development" describing a Lemko system that "supports wireless voice, data, and short message services."  Pl. Ex. 3 at 9,

17

12, 15.  In addition, Labun testified that Lemko was working on wireless local loop technology in July 2003.  Def. Ex. U, Labun Dep. 234:7.

Motorola also offers some direct evidence that Pan and Labun had conceived of the major Lemko products before mid-2004.  This includes a detailed document entitled "CASSE System Function Specification," with Pan listed as the author, indicating that it went through three drafts in 2002 and 2003, Pl. Ex. 7 at 2, and an undated e-mail from Pan stating:

> [W]e developed several products in our spare time [that] include:  IP mobile control and switches, Bluetooth and CDMA cellular mobile voice communication system and Bluetooth cellular data communication system. . . . Attached please find the introduction of the Company and some products.  If our plan goes smoothly, Lemko is the company that we want to establish, and it will be a company idependent [sic] from Motorola, Inc.

Pl. Ex. 2 at HW00000470.

Motorola primarily offers circumstantial evidence to support the inference that early Lemko activities demonstrated or depended on the fact that the Lemko technology had reached an advanced stage in its development.  Motorola argues that the communications, investor solicitations, and other Lemko documents predating mid-2004 go well beyond the limited showing defendants concede has been made:  "that some broad technology was thought of" by that date.  Defs.' Reply at 12.  Because defendants do not dispute that Pan and Labun were the inventors of the technology at issue, evidence of the technology's existence before they left Motorola is, Motorola argues, evidence that they conceived of it before doing so.

According to Motorola, this evidence includes a July 2003 e-mail from Desai, using the address nick@lemko.com, declaring that "we need to document . . . [w]hat

CASSE does" and "[h]ow it does it" and offering the recipient "a better understanding of our IP based architecture as a unifying point for CDMA/GSN and VoIP based solutions."  Pl. Ex. 9.  A July 2003 e-mail from Howell, using the address rhowell@lemko.com, attached a PowerPoint describing CASSE technology, which includes a description of its "distributed architecture" as well as multiple diagrams and designs.  Pl. Ex. 11.

An April 28, 2004 e-mail from "Nick" at "Lemko" to Pan and Labun refers to an upcoming meeting with someone whom the sender hopes will "like the Lemko system." Pl. Ex. 13.  The e-mail states, "The demo - its got to be working and totally perfect. . . . - bring all the bells and whistles - the user provisioning computer, IP-PBX, and [i]f they have an analog phone line, whatever it takes to call the outside world.  Everything."  *Id*. The e-mail later refers to "The Lemko DMA Architecture - Block Diagram."  *Id*.  Multiple documents advertise steps such as trial runs or testing in other countries that Lemko purported to have conducted or planned prior to "Q-2 2004."  *E.g.*, Pl. Ex. 12 at LEM112758.

Motorola also offers evidence that Lemko began to pursue patent applications almost immediately after it was founded, arguing that this supports the inference that the ideas embodied in the Lemko patents and applications currently at issue were sufficiently definite before early 2004 to support patent filings at that time.  A document entitled "Business Plan" states, "Lemko will file for several patents for CASSE functionality and design.  Patents will be filed by October 1, 2002."  Pl. Ex. 3 at 13.  A September 3, 2002 e-mail from Vorick, using the e-mail address information@lemko.com, to Pan and Labun states the following:

> I contacted the individuals you requested, and Jin and I have talked. He is sending me an e-mail tomorrow, and I'll reply with the required patent information.
>
> The patent filing process and fee schedule are very complex. The filing guide refers to many forms, procedures and articles. All patents can be filed under Lemko's name. I strongly recommend we use a patent lawyer for the actual filings.
>
> The engineers and I can compile all the information and format it in the manner required by the US Patent and Trademark Office (USPTO). This will save Lemko several hours of legal fees. Then we can have a lawyer review them and file the actual forms.

Pl. Ex. 4. An e-mail from Vorick at the same address, dated September 12, 2002, states:

> Completed Action Items . . . 1. Research patent filing process, necessary forms and data to file Lemko related patents. Email results to engineers, investor team. 2. Contact and work with Hechun Cai and Jin regarding patents. Request they document necessary information to patent submission.

Pl. Ex. 6.

An undated document entitled "Lemko Corporation Executive Summary" includes a statement that Lemko "will deliver" something "in Mar 2004," suggesting that the document was created before that date. The document states that "Lemko has identified and its patent council has reviewed 12 key patent applications which are in the filing process. In addition, as new applications are spawned from the core CASSE architecture, a continuing flow of intellectual property creation will be generated." Pl. Ex. 8 at LEM112756.

Although defendants argue that Lemko was not funded or otherwise functional for the first year or two after its August 2002 incorporation and that there is no unambiguous indication that the senders or recipients of these e-mails were "Lemko

personnel" *per se*, a reasonable jury could infer from the e-mails that both the senders and the recipients were associated with the developing company and taking actions on its behalf by mid-2002.

Defendants concede in their reply brief that "Motorola has shown that Pan and Labun may have conceived of DMA, without the critical claimed computer-readable medium component, while employed by Motorola." Defs.' Reply at 12. They argue, however, that "showing that some broad technology was thought of does not constitute proof that a specific patent claim was conceived." *Id*. Pan and Labun have testified that they did not conceive of or develop any of the inventions embodied in the patents until later, and a reasonable jury could believe them.

The Court concludes, however, that Motorola has presented evidence from which a reasonable jury could find that Pan and Labun had conceived of the ideas for CASSE, DMA, and/or systems related to the two before they departed from Motorola. A jury could find that defendants' understanding of these technologies was sufficient to support multiple business plans and investor solicitations, complete with descriptions and diagrams. And the fact that twelve concepts were sufficiently developed for Vorick to work with engineers on compiling and formatting their descriptions for patent applications by September 2002 could support inferences that the technology was fully or mostly invented, and that, as Motorola argues, the eighteen applications that Pan and/or Labun eventually filed were similarly "spawned from the core CASSE architecture." *See* Pl. Ex. 8 at LEM112756.

A reasonable jury could therefore find that the Lemko patents concern "inventions, innovations, or ideas developed or conceived" by Pan and Labun during

21

their employment with Motorola – particularly, as the Court described in the previous section, in light of the broad language of their employment agreements. *See Picture Patents,* 788 F. Supp. 2d at 136. This is especially true in this case because the employment agreements specifically reference "ideas," not just "inventions." *See Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 909 (9th Cir. 2010) ("[I]deas . . . are ephemeral and often reflect bursts of information that exist only in the mind. . . . [Employee] may have conveyed rights in innovations that were not embodied in a tangible form by assigning inventions he 'conceived' as well as those he reduced to practice.").

The Court acknowledges defendants' argument that it is unreasonable to infer, with regard to the later Lemko patent applications, that Pan and Labun waited five years after conceiving of certain of their inventions before seeking to have them patented. The Court does not see a proper basis, however, to draw in the summary judgment context a hard-and-fast line at any particular point in time. A reasonable jury could find that all of the inventions at issue are interrelated enough to infer that their initial conception occurred around the same time and that this took place during Pan and Labun's employment at Motorola.

### c. Recording

Finally, defendants argue that even a jury were to make all the above inferences, Lemko owns the patents because it recorded its interest in them and Motorola has not done so, giving Lemko priority under the patent recording statute. *See* 35 U.S.C. § 261. The parties agree that, in order for this argument to succeed, Lemko must be a "bona fide purchaser" of the patents, meaning that it recorded its interest "without notice" of

22

any prior claim by Motorola. *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991).

Defendants argue that Motorola cannot show that Lemko had any such notice. Motorola contends first that the knowledge possessed by Pan and Labun can be imputed to Lemko because they are Lemko officers. Defendants do not appear to disagree, but they dispute that there is any evidence of Pan and Labun's notice of a prior claim by Motorola. This is an absurd argument. Pan and Labun were certainly on notice of the terms of their written agreements with Motorola, which is what gives rise to notice that Motorola had a prior claim to inventions within the agreements' scope. "'Notice' under § 261 can include either constructive or inquiry notice, in addition to actual notice." *Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 843 (Fed. Cir. 2009). In this case, a reasonable jury could find either or both types of notice on Lemko's part based on Pan and Labun's knowledge of the terms of their agreements with Motorola. And, contrary to another argument made by defendants, a reasonable jury could also find that Motorola did not invalidate its prior claim by "sleeping on its rights" on the theory, supported by the evidence, that it lacked knowledge of Pan and Labun's inventions until it received discovery materials detailing the specifications of Lemko's products.

For these reasons, the Court denies defendants' motion for summary judgment on count six.

## B. Trade secrets claim

In addition to Pan and Labun, Motorola has accused Bai, Pyskir, Cai, Zhang, Saxena, Vorick, and Desai, along with several other defendants who have not joined

this motion, of misappropriating its trade secrets. To prevail on a trade secret claim under the Illinois Trade Secrets Act, 765 ILCS 1065/3(a), a plaintiff "must demonstrate that the information at issue was a trade secret, that it was misappropriated, and that it was used in the defendant's business." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003).

Defendants make two arguments in their motion. First, they argue that Motorola failed to present sufficiently specific evidence in support of its claims, both as a matter of law and under its discovery obligations. Second, they argue that even if Motorola is deemed to be in compliance with its discovery obligations, it has not offered evidence from which a reasonable jury could find that the information at issue constituted a trade secret or trade secrets. Defendants do not dispute, at least for purposes of the present motion, whether the information was misappropriated or used in their business.

### a. Specificity

In May 2011, the Court directed the parties to prepare a joint discovery status report and proposed discovery schedule. This case had already progressed through several rounds of interrogatories, document submissions, and motions to compel. In the joint report, defendants sought written responses and documents on "four narrow topics" on which they contended that Motorola had "never provided specific and particularized" responses. Joint Submission Regarding Proposed Discovery Schedule of June 1, 2011, at 3 (dkt. no. 740). Defendants identified these topics as:

1.    Motorola's specific identification by filename and filepath of any Motorola source code found within Lemko's code and/or products as part of the analysis in Clean Rooms 1, 2 and 3, the origin and creation of such source code at Motorola and the alleged dissemination and/or use of such source code by Lemko;

24

2.      Other than as provided in response to (1), specific identification of the Motorola source code, trade secrets and/or confidential information that Motorola claims has been used by Lemko, including the specific Lemko product in which it was allegedly used;

3.      Motorola's specific identification by claim number and/or column and line numbers of any Motorola trade secrets and/or confidential information that Motorola contends is reflected in each of Lemko's patents and patent applications of which Motorola seeks ownership, and the origin and creation of such information at Motorola and the alleged dissemination and use of such source code by Lemko; and

4.      All source code providing or relating to location based services used in Motorola's phones or any other products from 2007 to the present, whether created by Motorola, MMI or any third party.

*Id*. at 4.

At a status hearing regarding the joint report, the Court directed Motorola to provide additional discovery in response to defendants' four requests.  The Court stated that these requests were "relevant" and "not unduly burdensome" and that they "go to the heart of at least part of the theory of the case."  June 2, 2011 Tr. at 12.  The Court then told Motorola's counsel, "I acknowledge that your investigation may be ongoing, and so . . . it may be . . . appropriate . . . for you to say, these are our answers and there may be more when we get discovery."  *Id*.  Referring to the discovery responses that Motorola had produced prior to that date, the Court went on to say:

If your answer is, we have already answered this, then – listen to me carefully – you're going to be stuck with it. . . .  The responses that exist right now, to call them amorphous would be a bit of an understatement.  I mean, there's certain things about them that are specific and there's certain things about them that are really amorphous. . . .

Except to the extent that you legitimately discover something after the fact, you are going to have these answers hung around your neck for the balance of this trial. . . .  [W]hat I am after here is people need to have a stationary target to shoot at.  Up to this point in time, it's been less than stationary, okay, and that's going to come to an end.

*Id*. at 12-14.

On July 5, 2011, in response to the Court's directive, Motorola produced a forty-two page response containing interrogatory-style answers as well as numerous citations to additional exhibits and its previous discovery responses. Def. Ex. 2. Defendants argue that this response did not comport with the Court's directions. They contend that Motorola was required to identify "Motorola source code filenames and filepaths within Lemko's code, the origin and creation of such code at Motorola, the alleged dissemination and/or use at Lemko including the specific Lemko product and the claim number and/or column numbers of any Motorola trade secrets reflected in Lemko's patents." Defs.' Mem. at 5. Rather than doing this, defendants claim, Motorola provided "generalized and overinclusive" information such as lists of "numerous (and seemingly boundless) areas of Motorola technology" with no "coherent explanation as to which or how any specific information constitutes a trade secret." *Id*. at 5-6.

Defendants argue that, in addition to running afoul of the Court's directive, Motorola's responses are insufficiently specific as a matter of law to defeat summary judgment on a trade secret misappropriation claim. The Seventh Circuit has overturned a jury verdict that it found to be based on a plaintiff simply "point[ing] to broad areas of technology and assert[ing] that something there must have been secret and misappropriated." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). The court has also upheld a grant of summary judgment based on a finding that a description of software that "does not separate the trade secrets from the other information that goes into any software package" is insufficient, because "a plaintiff must do more than just identify a kind of technology and then invite

26

the court to hunt through the details in search of items meeting the statutory definition." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002).

Motorola does not dispute that it has produced a large volume of information, but it contends that its responses have been much more specific than defendants claim. Motorola's July 5, 2011 submission, produced in response to the Court's directive, made numerous references to specific materials. It referred to many documents contained in the "clean rooms" created for discovery in this case – literally, locked rooms in which materials were placed for review on an attorneys'-eyes-only basis. Motorola also contends that it did not have access to Lemko's backup server for anything other than its original search protocol until September 15, 2011, and therefore that there may be additional responsive information available that it had not yet reviewed as of October 28, 2011, the date of its response to defendants' summary judgment motion. In particular, Motorola stated in its July 2011 discovery responses that it had not been provided with "any information showing what source code is contained in which Lemko products." Def. Ex. 2 at 6. Without this information, Motorola argues that it has had difficulty indicating exactly which Lemko software or products it believes contain, incorporate, or otherwise make use of protected Motorola source code, a central component of its allegations.

Motorola's July 2011 submissions and its prior interrogatory responses make numerous references to documents or other attached exhibits that it has not submitted to the Court, some of which are contained in the clean rooms. Although the Court typically would not be able to adjudicate a discovery dispute without viewing all the evidence at issue, defendants do not appear to dispute that the exhibits contain the

27

items that Motorola says they contain. Rather, they contend only that these exhibits and Motorola's descriptions of them identify trade secrets with insufficient specificity. As described more fully below, the Court concludes that it may properly analyze this argument without viewing most of the underlying documents, because Motorola's identification and description of the information at issue is sufficiently specific to defeat defendants' argument.

Motorola's original interrogatory responses, its submission in response to the Court's order, and its response to defendants' motion for summary judgment identify the following information as protected trade secrets:

● The architecture of the seamless mobility system, as well as the source code for each of the individual elements and connections between them, in particular the elements known as SIP-GW, CNCP, and AAA. Pl.'s Resp. at 2, 11.

● 375,000 files identified in two spreadsheets in Clean Rooms 1 and 2, as well as two sets of Bates numbered pages listing source-code files previously produced that "are identical to, the basis of, or reference" the files identified in the spreadsheets. Def. Ex. 2 at 7-8.

● A list of 4,084,713 files from Lemko's backup server that had a "fuzzy hashing" percentage match of 50% or greater with several Motorola files. Pl.'s Resp. at 10.

● Source-code files and artifacts, as well as email and logfile documentation of the use of source code, found on Lemko's or individual defendants' computers. Def. Ex. 2 at 12-13.

● Eleven other categories of information, the descriptions of which identify the location where Lemko files containing Motorola source code have allegedly been found and reference lists of specific documents. Def. Ex. 2 at 18-33. These include:
 ● Thumb drives and documents recovered from defendant Sheng.
 ● Documents and source code produced by Lemko that are marked "Motorola Confidential Proprietary" or otherwise designated as confidential.
 ● A spreadsheet in Clean Room 3 containing 1,649 documents marked by filename and filepath.

- Source code developed by Sheng for a voicemail product.
- A ZIP file emailed by a Lemko employee containing source-code files.
- Four Motorola product roadmaps and other development documents in Lemko's possession.
- Seven specific seamless mobility elements and testing/debugging tools.
- "Vocoder" designs and code.
- Documents taken by defendant Jin referring to "group call" technology.
- Files from particular folders on Pan and Wu's computers.

- Numbered documents listed in Motorola's Response to Defendants' Interrogatory Number 4. Def. Ex. 3 at 6-9.

The Court concludes that this evidence is sufficiently responsive to its order of June 2, 2011. Defendants requested "specific identification by filename and filepath" as well as identification of "trade secrets and/or confidential information." Another judge in this district recently noted that a similarly-worded request did not "ask [plaintiff] to isolate the information that is trade secret, but rather . . . to lump trade secrets in with other proprietary and confidential information . . . thus rendering [the] response in some sense accurate." *Charles Schwab & Co., Inc. v. Carter*, No. 04 C 7071, 2005 WL 2369815, at *11 (N.D. Ill. Sept. 27, 2005). Motorola's response similarly includes both types of information.

Moreover, the cases that defendants cite as finding a plaintiff's identification of trade secrets to be insufficiently specific as a matter of law dealt with responses far more vague than Motorola's. The court in *IDX* found "a 43-page description of the methods and processes . . . making up IDX's software package" insufficient. *IDX*, 285 F.3d at 584. The court in *Schwab* distinguished the case from *IDX* because Schwab "identif[ied] its 'trade secrets' by Bates number and computer file type. By doing so, [it] would survive summary judgment." *Schwab*, 2005 WL 2369815, at *12. Like Schwab, Motorola has identified its alleged secrets by Bates number, file type, and/or location –

29

it has not simply described an area of its technology.

The court in *Schwab* further distinguished two additional cases that defendants also cite in their summary judgment briefs. In one, a plaintiff "'consistently failed throughout [the] litigation to identify any particularized trade secrets actually at risk,' but rather contended only that it held trade secrets in 'a host of confidential information [including] business and strategic planning information,' 'manufacturing information,' 'financial information,' and 'marketing and customer information.'" *Id*. (quoting *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987)). In another, the plaintiff "was unable to identify any 'computer printouts, formulae, memoranda, or any other tangible technical data, identifying its trade secrets.'" *Id*. (quoting *Lynchval Sys. Inc. v. Chicago Consulting Actuaries, Inc.*, No. 95 C 1490, 1998 WL 151814, at *5 (N.D. Ill. Mar. 27, 1998)).

Another judge in this district similarly found that a plaintiff's argument – "to determine [the] trade secret, [defendant] need merely look at the lines of code which [plaintiff] identified and examine the design, structure, and programming techniques and the integration into the code" – came "dangerously close" to being too vague. *Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2005 WL 743083, at *13 (N.D. Ill. Mar. 31, 2005). Nevertheless, the plaintiff survived summary judgment because it "did identify specific lines of code and specific software features for which it claims protection." *Id*.

Like the plaintiffs in *Schwab* and *Do It Best*, Motorola has done more than merely "identifying broad areas of technology." *See Composite Marine*, 962 F.2d at 1266. Although Motorola has identified a large number of items, it has referred to

particular documents, files, inventions, and aspects of its technology, not simply general methods or areas of its business.

For these reasons, the Court declines to grant summary judgment on the ground of insufficient specificity. The terms of the Court's June 2, 2011 directive stand, however: Motorola is limited at trial to the items it has identified in response to defendants' requests, unless there is some legitimate basis for further supplementation.[3]

### b. Secrecy

Defendants contend that Motorola has not demonstrated that the information that it contends defendants took meets the statutory definition of a trade secret: information that "is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d).

As evidence of its efforts to maintain secrecy, Motorola first presents the declaration of Michael Salzman, who has served as Director of Security and Director of Investigations for Motorola. Salzman testified that Motorola "uses physical and logical access security measures to prevent access" to secret information. Salzman Dec. at 2. He described Motorola's policies governing "Protection of Proprietary Information" and "Appropriate Use of Computer Resources," which establish who may have access to

---

[3]The Court does not intend its description earlier in this section of certain Motorola discovery responses to constitute a comprehensive list of those items Motorola has already identified.

confidential information and how information may be handled, transferred, and

distributed.  *Id*. at 3.  Motorola further argues that the documents, files, and source code

that are the subject of its claim were all marked and/or otherwise kept confidential within

the meaning of these policies.  It also points to documents signed by each of the

defendants when they began their employment at Motorola reflecting their agreement to

abide by these policies.

> The Seventh Circuit has stated that
>
> [t]he existence of a trade secret ordinarily is a question of fact.  As aptly
> observed by our colleagues on the Fifth Circuit, a trade secret "is one of the most
> elusive and difficult concepts in the law to define."  In many cases, the existence
> of a trade secret is not obvious; it requires an ad hoc evaluation of all the
> surrounding circumstances.  For this reason, the question of whether certain
> information constitutes a trade secret ordinarily is best "resolved by a fact finder
> after full presentation of evidence from each side."

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003)

(quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288-89 (5th Cir. 1978))

(internal citations omitted).  This is particularly true regarding the question of "[w]hether

the measures taken by a trade secret owner are sufficient to satisfy the Act's

reasonableness standard."  *Id*. at 725.  It is "only in an extreme case [that] what is a

reasonable precaution [can] be determined as a matter of law, because the answer

depends on a balancing of costs and benefits that will vary from case to case."  *Id*.

(citation and internal quotation marks omitted).

Efforts like Motorola's have been deemed sufficient to qualify similar information

for trade-secret protection.  *See, e.g.*, *BondPro Corp. v. Siemens Power Generation,*

*Inc.*, 463 F.3d 702, 709 (7th Cir. 2006) ("[N]egotiating confidentiality agreements with

employees, customers, and suppliers . . . and assuring that the process itself and

documents describing it were kept under lock and key" were "measures to conceal [a] process that a reasonable jury could find sufficient."); *Catapult Commc'ns Corp. v. Foster*, No. 06 C 6112, 2010 WL 3023501, at *2 (N.D. Ill. July 30, 2010) ("A genuine issue of material fact exists as to whether Plaintiff kept the . . . information secret" because "Plaintiff claims that [the] information was never made available . . . without a confidentiality agreement."); *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (N.D. Ill. 2004) ("[P]rocedures demonstrat[ing] reasonable efforts to keep the source code secret [are] all that is required under the ITSA," particularly when "defendants . . . knew that the source code material was intended to remain secret.").

The Court finds these decisions persuasive. A reasonable jury could find that the information described earlier was the subject of reasonable efforts by Motorola to keep it secret. A reasonable jury could also infer that, based on Motorola's efforts, the information had remained secret in a way that would allow Motorola to derive economic value from it.

Defendants argue that this cannot be true because some or all of the information was public, either because Motorola had posted elements of the source code or product specifications on the Internet or because the information contained too many industry-standard "common and generic terms, phrases, acronyms, messages, strings, and other coding fundamentals." Defs.' Mem. at 12. The Seventh Circuit, however, has found that a trade secret "can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595-6 (7th Cir.

2001). This information may consist of "a host of materials which would fall within the public domain" but that nonetheless qualify as trade secrets when "processes . . . have been created by combining those materials into a unified system which is not readily ascertainable by other means" and which "took the company . . . years and considerable income to perfect." *Id*. at 596. Moreover, *Minnesota Mining*, unlike *IDX*, did not involve "self-revealing information" that "any user or passer-by sees at a glance," such as "the appearance of data-entry screens." *IDX*, 285 F.3d at 584. Although some of the information that Motorola seeks to protect was contained in publicly available documents or devices, the Court is unpersuaded, at least for purposes of the present motion, that it was so self-revealing as the simple appearance of a screen.

As indicated in the previous section, the Court is hesitant to rule on a motion for summary judgment when much of the information at issue has not been provided to it. Motorola provides the declaration of its employee Fei Wu, which describes and includes examples of the source code for one component of the seamless mobility system, but its trade secret allegations go far beyond that. Nonetheless, just as defendants' primary argument in the previous section concerned the specificity of Motorola's description, their primary argument here concerns the secrecy, rather than the content, of Motorola's information – they expressly admit that they are not disputing in the present motion whether the information was misappropriated or used in their business, which presumably would require much more specific evidence. In light of the Seventh Circuit's clearly stated preference for resolution by a fact-finder of disputed trade-secret issues, particularly the question of efforts to maintain secrecy, the Court concludes that a reasonable jury could find that Motorola has demonstrated that its information was the

34

subject of reasonable efforts to maintain secrecy and remained sufficiently secret to provide economic value. The Court therefore denies defendants's motion for summary judgment on count two.

### c. Remaining claims

Defendants argue that because Motorola has not established the existence of trade secrets, its claims for usurpation of corporate opportunity and breach of contract necessarily fail as well. Because the Court has concluded that a reasonable jury could find that Motorola has established the existence of trade secrets, it denies defendants' motion for summary judgment on counts five, seven through eleven, and thirteen.

### Conclusion

For the reasons stated above, the Court denies defendants' motions for summary judgment [docket nos. 784 and 788].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 10, 2012